No. 108.—BIBB COUNTY LOAN ASSOCIATION, plaintiff in error, *vs.* ALEXANDER RICHARDS, defendant in error.

[1.] The origin and history of Building and Loan Associations and their mode of operation.

[2.] Are their loans usurious apart from their Charters? *Quere.*

[3.] An act of the Legislature incorporating a Building and Loan Association, by their Constitution and By Laws, without the same being embodied in the act, is constitutional and valid.

[4.] If the charter of the Bibb County Loan Association be valid, and the proceedings against one of its members be in accordance therewith, it will be maintained and enforced by the Courts.

Foreclosure of Mortgage in Bibb Superior Court. Decision by Judge ALLEN, December Term, 1856.

This was a proceeding instituted by the Bibb County Loan Association, against Alexander Richards, a member of said Association, to foreclose a mortgage on a house and lot in the city of Macon.

The mortgage was executed to the Association, as security for the payment of a bond of which the following is a copy, to-wit:

STATE OF GEORGIA, BIBB COUNTY.

*Know all men by these presents,* That I, Alexander Richards, of the said State and county, am held and firmly bound unto William S. Williford, Treasurer of the Bibb County Loan Association, his successors in office and assigns, in the just and full sum of two thousand dollars, for the true payment of which, I bind myself, my heirs, executors and administrators, firmly by these presents. Sealed with my seal and dated the 20th day of June, 1854.

*The condition of the above obligation is such,* That whereas, I the said Alexander Richards, have this day procured an advance of two thousand dollars on the ten shares of stock which I hold in said association, from the Bibb County Loan Association, under the Constitution and By-

Laws thereof. Now, should I, the said Alexander Richards, my heirs and executors or administrators, well and truly pay to the said Association, so long as it shall continue to exist, the sum of ten dollars monthly, on its regular day of meeting, being installments due on said stock, on which an advance was so procured as aforesaid, and the further sum of ten dollars monthly as aforesaid, on the same day, as interest on said advance, then this obligation to be void, otherwise of full effect.

ALEXANDER RICHARDS, [L. S.]

Sealed and delivered in the presence of

E. MASSENET,

GEO. S. OLIVER, Not. Pub.

The mortgage was of the same date with the bond; recited that it was made to secure the payment of the instalments and interest mentioned in this bond; and conditioned to be void upon the payment of said installments and interest, as conditioned and provided for in said bond.

On the same day, Richards executed an assignment to the Association of his ten shares of stock as collateral security, for the payment of the bond and mortgage, but agreeing nevertheless, to pay the monthly installments on said shares as required by the rules of the Association, and the interest on said advance.

The defendant pleaded:

1st. That the Association was not a body corporate, and could not as such institute and maintain this suit.

2d. That he had fully paid all that was legally due on said bond and mortgage.

3d. That the same were usurious.

Plaintiff first introduced in evidence the bond and mortgage and assignment.

Plaintiff next offered in evidence a printed copy of the Constitution and By-Laws of the Association, which by con-

sent, was admitted in lieu of the originals: It was also admitted that the Treasurer had proved the organization of the Association as therein set forth, prior to their application to the Inferior Court for a charter, as authorized by statute; defendants counsel reserving the right to except to the legality of this proving by oral testimony of such facts.

The following certificate of the Treasurer was by consent, received in evidence, to-wit:

MACON, Ga., Nov. 22, 1856.

This is to certify that the actual advances made to the members of the Macon Building and Loan Association from its commencement to 3d November, 1856, have been at an average of 46 13-16ths per cent. premium; and to the members of the Bibb County Loan Association from its commencement to 20th November, 1856, at an average of a fraction over 48⅜ per cent. premium.

W. S. WILLIFORD,

Treasurer of the Associations.

Macon,    -    -    -    -    -    46, 13-16.
Bibb,    -    -    -    -    -    -    48⅜

The records from the Inferior Court of Bibb county, showing the application of the association for a charter and the order granting it, were admitted in evidence, by consent; defendant reserving the right to except to the equity and relevancy of the testimony.

It was further admitted that the Constitution and By-Laws were printed by order of the association, and a copy furnished to each member, defendant among the rest, before they signed said Constitution and By-Laws.

Plaintiff also read in evidence the Act of the Legislature, passed at the session of 1855-6, incorporating the association.

The case was, by agreement of counsel, submitted to the presiding Judge to pronounce judgment, without the intervention of a jury, who sustained the pleas, and granted the

rule absolute only for the sum of $975, being the amount of the bond, less the amount paid by defendant as installments and interest.

And plaintiffs' counsel excepted to said judgment and decision, and assigns the same as error.

LANIER & ANDERSON; and BAILEY, for plaintiff in error.

NESBITS, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

My first purpose was to consider two questions only, viz: 1st. Is the act of incorporation constitutional and valid? And, 2d. Did the charter authorize the contract from which Richards seeks to be relieved?

Reflecting, however, upon the novelty and importance of the matters involved in this case, and the learning exhibited in its discussion, I have concluded to take a more extended view of the points in controversy.

From a work published in 1854, by Mr. A. Cummings, Jr., Boston, upon Building Associations, it seems that these associations originated with the Earl of Selkirk, in Scotland, in 1815. The motives of their founder were purely benevolent, and the experiment was eminently successful on account of the beneficial influence they exerted upon the industrious classes; they soon attracted the attention of the British public; and they have spread and multiplied in that country, to an incredible extent. In 1836, the British Parliament passed an act, affording the most ample facilities for their formation and control.

In the year 1836, twenty-one years after the first one was established in Great Britain, the first association of this kind, called "The Brooklyn Building and Mutual Loan Fund Association," was organized in Brooklyn, New York; and from that time they have continued to spread from State to State, and City to City, until at present, they pervade every

portion of the Union. They number already some sixteen in Georgia. That they have improved our towns by leading to the erection of a number of new buildings, furnished many families with homes of their own, that could not otherwise have possessed them; given a considerable impulse to mechanical enterprize, and in many other ways promoted the prosperity and welfare of the communities where they exist, is undoubtedly true. But whether they will continue to' be entitled to the epithet of the " poor man's exchequer," and whether they will, as they promise to do, enable every man to become his own landlord, will depend entirely upon the manner in which they conduct their business. Under existing regulations, I have been led seriously to doubt this. The interest of the *borrower*, as well as the accumulator, will have to be sedulously regarded and protected; otherwise they will forfeit the public confidence and cease to prosper. If all the members were borrowers, and such was the original idea upon which these associations were founded, the plan would work well. But in every such association, a large number of the stockholders do not join with the view of taking loans, but for the purpose of investing their money where it will yield a profitable return. These are called *accumulators;* while they share in the profits of the institution, they contribute nothing to produce them; and as a necessary consequence, the borrowers have to pay a larger interest to make a given rate of dividends, than they would, if they produced these dividends only for themselves.

To those who feel curious to investigate this subject more thoroughly, I would refer them to a small volume published in Charleston in 1852, on the "Mutual Benefit of Building and Loan Association:" and also to a book recently published in Connecticut, which is replete with all the learning upon this mysterious scheme. And to which is added by the author who was two years a Director of one of those associations, a model plan for their management; the opera-

Bibb County Loan Association vs. Richards.

tions of which he confidently believes, will secure results uniformly equitable to all parties.

This is a brief outline of the origin of Building and Loan Associations. Their friends and advocates who claim for them an antiquity older than the Chistian era, insist that they are peculiarly propitious to the poor, by stimulating them to save small sums from the grog-shop and the gambling house, and to purchase with their hoarded earnings, happy homes for themselves and families; and that the terms upon which they procure help for this purpose, are such as they could get no where else; and not so hard as those exacted by monied men who will not give long indulgence to any, especially those in straitened circumstances. That another object which they subserve is, to supply a place of safe deposit for the savings of the stockholder in which they are entitled to receive lawful interest, which is not allowed by Banking and other corporations.

On the other hand, it is asked, why so much complication and mystery about a system designed for the benefit of the masses, especially the poor and the humble? That it is all for the purpose of concealing the repulsive interest which they charge. That nothing can be understood of its workings, except that it produces most gratifying gains to the capitalist who invests his money in it to accumulate. That the borower once in the web may, like the little fly, struggle in vain, to escape the entanglement. That the roof which he hoped would have sheltered him, crumbles beneath the mortgage that overspeads it. That the sooner these institutions are abolished the better.

I here dismiss these preliminary observations, leaving the utility and danger of Building and Loan Associations to puzzle wiser heads than mine, as they have done hitherto.

The following is the Constitution and By-laws of the Bibb County Loan Association, by which it was incorporated.

*Constitution of the Bibb County Loan Association, adopted June 9th, 1854.*

RULES.—1st. Reading and taking action on minutes of previous meeting.

2d. At 8½ o'clock from April to September, inclusive, and at 7½ o'clock from October to March, inclusive, the business of loaning shall commence, and continue until all the funds on hand are disposed of.

3d. Loans shall be sold as follows: $1,000 shall be put up, and the successful bidder shall be privileged to take the lesser sum of 800, 600, 400 or 200 dollars, at his option.

4th. The successful bidders shall be required to hand in to the Secretary, on the night of meeting, the number of the lot, and description of the property proposed to be mortgaged.

*Note.*—It is expected, that members being successful bidders, will present their papers to the Solicitor for examination, within twenty-four hours after the monthly meeting.

OFFICERS.—A. R. Freeman, *President ;* T. R. Bloom, Daniel F. Clark, E. C. Granniss and J. M. Boardman, *Directors ;* W. S. Williford, *Treasurer and Secretary ;* Lanier & Anderson, *Solicitor.*

## Constitution.

ARTICLE I.—*Title and Object.*—This Association shall be entitled the *Bibb County Loan Association,* and shall have for its object, the accumulation of a fund, by the monthly subscriptions or savings of the members thereof, to assist them in procuring for themselves, such real estate as they may deem desirable.

ARTICLE II.—*Members.*—SECTION 1. Any persons legally qualified to hold property may become members of this Association.

SECTION 2. Each stockholder, for each share of stock by him or her held, shall pay the sum of one dollar in par funds, on subscribing, and the same amount on or before 6 o'clock, p. m., of the third Thursday of each and every month there-

after, to the Treasurer, or such other person or persons as shall, from time to time, by the laws and regulations of the Association, be authorized to receive the same, until the value of the whole stock shall be sufficient to divide to each share of stock the sum of two hundred dollars. Seven per cent. interest shall be allowed to all shareholders who make advance payments for six months or longer.

SECTION 3. When each stockholder, for each and every share of stock by him or her held, shall have received the sum of two hundred dollars, then this Association shall determine and close; provided, always, that any stockholder having obtained an advance, in the manner prescribed under Article VIII., shall be debited in his account with the premium paid thereon.

SECTION 4. Should any stockholder fail to meet his or her dues, as often as the same shall be payable, as aforesaid, he or she shall forfeit and pay the additional sum of ten cents for every such failure, and for each dollar thus unpaid; the same to be charged with the monthly dues.

SECTION 5. Should any stockholder neglect or refuse to pay his or her monthly dues or fines, for more than three months, the shares shall be forfeited to the Association, and shall be offered for sale in such manner as the Directors may determine.

SECTION 6. Should any stockholder, not having received an advance, wish to withdraw from the Association, he or she shall be entitled to receive from the Treasurer, the amount of dues actually paid, first deducting all fines and arrearages, with his or her proportionate part of any losses and expenses sustained; provided, however, that no stockholder, wishing to withdraw, gives less than one month's notice to the Directors of such intention.

Transfer of stock may at any time be made in the presence of the Treasurer, attested by his signature; but no such transfer shall be valid until all arrearages or fines that may be due upon said stock shall have been fully discharged. Such

transfer must be made at least thirty days before an election to entitle the holder thereof to vote.

SECTION 7. In the event of the death of a member who has received no portion of his or her stock in advance, the heirs or legal representatives of the deceased may continue his or her relation to the Association ; or, should they prefer it, they shall be entitled to receive from the Treasurer the amount he or she may have paid upon his or her shares, with seven per cent. interest ; first deducting any charges for fines, arrearages, or proportion of losses and expenses sustained.

SECTION 8. No stockholder shall hold, in his or her own right, more than forty shares.

SECTION 9. Each stockholder, for each and every share of stock by him or her held, either in their own right, or as trustee, shall be entitled, when personally present at an annual election, or special meeting, to one vote, for the election of officers, and other purposes.

SECTION 10. Each member, upon subscribing for a share or shares, and making the first monthly payment on the same, shall be entitled to a certificate of such share or shares, specifying the number thereof, and signed by the Treasurer ; which certificate shall be evidence of his title thereto.

SECTION 11. Each stockholder shall sign this Constitution ; thereby obligating himself or herself to pay punctually their monthly dues, interest and fines, and to fulfill all other requisitions herein contained.

ARTICLE III.—*Officers.*—The officers of this Association shall be a President, Treasurer, Secretary, and four Directors, exclusive of the President, (who shall be *ex officio* a member of the Board,)—all of whom must be stockholders. They shall be elected at the annual meeting of the stockholders, on the evening of the third Thursday in June, in each and every year. A majority of all the votes represented or present shall determine an election.

Should any officer die, or resign in the interim between

one election and another, the Board of Directors shall have power to supply the vacancy.

ARTICLE IV.—*President.*—It shall be the duty of the President to preside at all meetings of the Association, and of the Board of Directors; to preserve order; to sign all drafts on the Treasurer, when ordered by the Board of Directors; and to perform all other duties usually pertaining to his office.

He shall have power, with the concurrence of two of the Board of Directors, to call a special meeting of the Association whenever he may deem it advisable.

ARTICLE V.—*Treasurer.*—It shall be the duty of the Treasurer to receive all moneys paid into the Association; and to pay all orders drawn upon him by authority of the Board of Directors, when signed by the President and countersigned by the Secretary. He shall receive and hold in trust, for the Association, all bonds, mortgages, polices of insurance, and other papers in connection with property upon which' money is loaned, first giving his receipt therefor to the Secretary. It shall be his duty, and he is hereby empowered to give releases and acquittance for all sums of money paid to the Association upon any bond, note, mortgage, or other security, and if necessary, acknowledge satisfaction of the same on record. He shall keep accurate accounts with the stockholders, and of all monies paid into the Association. His books shall be subject to the inspection of the Board of Directors; and he shall be prepared at all times, to inform the members of the state of their accounts, and at the annual meeting furnish a detailed statement of the finances of the Association. He shall give satisfactory bonds for the faithful performance of his duties; shall receive such compensation for his services as the Board of Directors may determine; and at the expiration of his term of office, deliver over to his successor all monies, books and papers in his possession belonging to the Association.

ARTICLE VI.—*Secretary.*—It shall be the duty of the Secretary to keep correct minutes of the proceedings of the Associ-

tion, and of the Board of Directors, and record the same in a book, or in books provided for the purpose. He shall attest all orders drawn on the Treasurer for the payment of money, under the authority of the Board of Directors; and notify the Directors and stockholders of their monthly and annual meetings, by advertisement in one or more newspapers, at the expense of the Association. He shall have charge of all books and papers belonging to the Association, except such as are entrusted to the Treasurer, and deliver up the same, in good condition, to his successor in office. The office of Treasurer and Secretary may be filled by the same person.

ARTICLE VII.—*Directors.*—SECTION 1. It shall be the duty of one or more of the Board of Directors to meet statedly, on the third Thursday evening of each and every month, (at such place as the Board may appoint,) with the stockholders, to dispose of the funds according to the Constitution, and to conduct the business of the Association generally.

SECTION 2. They shall hold, on the Monday after the monthly meeting, a special meeting, and other meetings as often as may be necessary, for the consideration of securities offered; and shall be empowered to appoint a Solicitor for the Association, whose business it shall be to examine all titles, and draw up all papers in connection with said securities. And in no case shall an order be drawn on the Treasurer for an appropriation, until the necessary searches in the courts of record shall have been made, and the Solicitor certifies to the satisfactory character of the security offered.

The charge for investigating titles, and preparing all necessary mortgage deeds and instruments in favor of the society, shall not in any case exceed the sum of $5, unless under special circumstances, when the fee shall be determined by the Directors. The Solicitor's charge shall be paid by the members on whose account they are incurred, or deducted out of the money they may be entitled to receive for any share or shares in advance, in the mode hereafter prescribed.

SECTION 3. A majority of the Board of Directors shall con-

stitute a quorum. They shall be empowered to fill all vacancies that may occur in their number, and to adopt any regulations for their government not disagreeing with this Constitution.

SECTION 4. They shall from time to time inspect the books and accounts kept by the Treasurer, and shall order a full statement of the affairs of the Association to be annually prepared by that officer, at least seven days before the annual general meeting of the members, at which meeting such statement shall be submitted, after having been first audited and signed by three members of the Association, selected by the Board.

SECTION 5. Any order on the Treasurer must be sanctioned by a majority of the Board, and signed by the President and Secretary.

ARTICLE VIII.—*Advances.*—SECTION 1. Each stockholder, for each and every share of stock he or she may hold in the Association, shall be entitled to purchase an advance of stock of two hundred dollars, and no more; provided, however, that no stockholder shall receive an advance to the amount of more than one thousand dollars at any one monthly meeting, if any other stockholder present, not having received an advance, shall bid for it at an equal premium.

SECTION 2. The amount paid into the treasury each month, shall, at the monthly meeting of the members, be sold to the highest bidder ór bidders among them.; provided the same be not sold under par, and be secured by real estate fully equal in value to the net sum advanced. Should it so occur that the funds of the Association remain unproductive and uncalled for, for the space of one month, the Directors are authorized to loan what may be on hand to others than stockholders, if it be safely invested, and repaid within one year. And should a balance remain after any monthly meeting of the Association, the Directors shall have power to loan the same on good security, to be repaid within ninety days.

SECTION 3. Any stockholder taking an advance shall allow

to be deducted the premium offered by him or her for the same; and shall secure the Association for such advance, by bond and mortgage, and policy of insurance, on any buildings there may be on the premises, renewed annually at his or her expense. He or she shall further pay all costs that accrue for examining titles, drawing, acknowledging, recording, and releasing all papers in connection with said security.

SECTION 4. For each advance of two hundred dollars made to a stockholder, one share of stock shall be assigned as collateral security. In case of failure to offer sufficient security for an advance, within one month from the date of purchase, the month's interest shall be charged to said purchaser, together with all costs and charges for the examination of titles, and his or her right to such purchase cease.

SECTION 5. Any stockholder taking an advance shall pay to the Treasurer, in addition to his or her monthly dues for shares, one dollar per month for each share on which such advance is made, or at the rate of six per cent. per annum on the whole amount, including the premium.

SECTION 6. No stockholder shall be entitled to an advance who is in arrears to the Association, and no property out of the limits of Bibb County taken as security for an advance.

SECTION 7. Should any stockholder, having received any portion of his or her stock in advance, neglect or refuse to pay any or all of his dues to the Association, for three successive months, then the Directors may compel payment of principal and interest by instituting proceedings on the bond and mortgage, according to law.

When any sale shall take place of any property mortgaged to the Association, the Directors shall have power to retain and apply so much of the purchase money as would be required to redeem the property, pursuant to the provisions contained in the ninth article of this Constitution, together with all other payments, monies, and expenses due to the Association, and shall pay the surplus thereof to the mortgagor.

SECTION 8. In the event of the death of a stockholder who

has received any portion of his or her stock in advance, the heirs or legal representatives of the deceased shall be entitled to continue his or her relation to the Association, the proper change of name, &c., being first made in the security papers; or, should they not be able or wiling to do this, then the Directors shall act as in the case above specified, with this difference—the heirs or legal representatives of the deceased being entitled to receive the actual amount he or she may have paid on his or her shares, first making any deduction for fines, arrearages, or proportion of losses and expenses sustained, with which he or she may be chargeable.

ARTICLE IX.—*Sale, Substitution, or Release of Mortgages.*—SECTION 1. Should any stockholder who has executed a mortgage to the Association, be desirous of selling the mortgaged property, subject to the mortgage, he or she shall be at liberty so to do, with the consent of the Directors, upon first duly transferring the shares secured by said mortgage to the intended purchaser; and upon such transfer being completed, and all arrears due to the Association from the mortgagor being paid, and the conveyance to the purchaser executed, such purchaser shall thenceforth become liable to pay all the monthly dues and interest payable in respect of such shares; and the Directors may grant to the original mortgagor, and at his or her cost and charges, a release from all future liability in respect thereof.

SECTION 2. It shall be lawful for any stockholder, having executed a mortgage in favor of the Association, to substitute, at his or her own expense, and subject to the approval of the Directors, any other real estate, as security to the Association, in lieu of that originally mortgaged.

SECTION 3. Should any stockholder desire to have his or her property discharged from mortgage before the Association shall have regularly terminated, he or she shall be allowed so to do, by paying into the hands of the Treasurer such a sum of money as shall, at the rate of premium the funds are then selling, produce the same monthly payment of interest as

that which said stockholder had been previously paying in his or her advance; provided such sum shall in no case be less than the net amount actually received by him or her; and provided further, that no release shall be given until the money paid for such release shall have been sold, and the security offered for the same be approved by the Directors, and the papers connected therewith duly executed; such shareholder paying all costs connected with the redemption of the mortgaged property.

ARTICLE X.—*Fines.*—In addition to the fines mentioned in the fourth section of the first article, the Treasurer and Secretary, for neglecting to attend to any of the annual or special meetings, or the meetings of the Directors, shall be fined for each and every such neglect, the sum of $1, unless he gives satisfactory excuse, to be judged by the Directors.

ARTICLE XI.—*Constitution.*—This Constitution can only be altered or amended at an annual meeting; and by a majority of the votes represented or present; and at least one month's notice of the proposed alteration must be publicly given.

ARTICLE XII.—*Number of shares.*—The capital stock of this Association shall be 1500 shares. But the Directors shall have power to issue a new series of stock at such times as they may deem expedient; Provided, the series shall be at least six months apart, and not less than 800 shares in a series. Shareholders in any new series shall not share in the profits of a previous series.

Thus it will be seen that the capital of this institution is not limited as other chartered corporations usually are, but the interest which a member has in it is estimated by the term "stock," of which each share has an ultimate value of two hundred dollars. The payments made to the association are levied monthly. When a person proposes to become a member he determines how many dollars he will pay monthly, in order to enjoy its benefits. If he agrees to pay

one dollar per month, his interest in it is one share of stock, and so on—each share of stock for which an individual subscribes requiring him to pay one dollar each month.

When a member has subscribed for any stock, he must continue to pay one dollar monthly for each share until his payments and his part of· the gains of the association amounts to two hundred dollars for each share, which sum is then paid to him by the association.

The money which the members pay on account of stock, either by monthly or advance payments, the institution loans. The premium on loans, constitute the gains of the institution. The time required for stock to mature, that is to accumulate, until each share is worth two hundred dollars, when the association terminates, is supposed to range from eight to ten years.

Now, Richards being a member of the Bibb County Loan Association, and holder of ten shares therein, 'bid off $2,000 at one of the regular meetings of the association, at fifty-one dollars and one-quarter per cent. premium. This premium being deducted he received in cash $975. To secure the fulfillment of the obligations which the reception of this advance imposed upon him, he transferred to the association ten shares of his stock, and executed his bond and mortgage in accordance with the constitution and by-laws. The conditions of the bond and mortgage are, that if he shall continue to pay monthly the amount which he, as a member of the association, had agreed, when he became a member to pay as installments on said stock, to wit: ten dollars; and should in addition thereto, pay ten dollars per month so long as the association should exist, as interest on said advance, then the bond and mortgage should be of no effect.

Is this contract usurious?

This question has been repeatedly discussed in the Courts of England. The first reported case upon the subject is that of *Silver et al. vs. Barnes,* 37 *E. C. L. Rep.* 335. The facts of the case were these : Under the society by-laws, 80

pounds was put up at auction, to the highest bidder. Barnes, the defendant, bid fifteen pounds, seventeen shillings and six pence; and gave his note with security for the payment of the 80 £ on demand with five per cent. interest. But instead of paying down his bid of 15£ 17s and 6d, by the rules of the society, it was to be paid by monthly installments of two shillings upon every ten pounds of the money advanced, until each installments should amount to the said premium of 15£ 17s and 6d called in the by-laws "The additional subscription." So that he gave at the rate of 17 per cent. per annum for the use of the 80£, about twenty months. But this was not all he paid. For by the 8th rule or by-law of the society, recited in the case, he pays other two shillings per month on every ten pounds of stock, it being the monthly installment on stock, which, if reckoned as so much paid for the use of the money advanced, as counsel for Richards contends in this case, would make another twelve per cent, which added to the seventeen would be twenty nine per cent per annum, or double what Richards pays.

Yet, this was held to be no usury; and this decision has been repeatedly approved by the British Courts. Vice Chancellor Parker, in *Burbidge vs. Cotton*, said "he was not aware that the authority of this case had ever been doubted," and it was approved by *Parke B. in Cutbill ve. Kingdom*, 8 *E. L. & E. Rep.* 62.

There are connected with this question, many interesting principles, such as whether a sale can be construed to be a loan, and whether the dealings with the funds of the partnerships are not exempt from the operation of the usury laws, unless in both of these cases they are a mere contrivance to evade these laws, 2 *Wm. Bl.* 859; 14, *E. C. L. R.*80; 3 *ib.* 109; 3 *T. R.* 538; 4 *East.* 55; 7 *Wend.* 569; 3 *Comstock*, 344; 4 *ib.* 672; 4 *Denio* 264; *Chitty on Con.* 704; 2 *Brown* 891; *Coll on Part.* 33–37; *Cowper* 793; 4 *T. R.* 358; 4 *Eng. Ch. Rep.* 64; 7 *Eng. C. L. Rep.* 314: 8 *Eng. L. and Eq.* 57; 31 *Eng. Ch.* 87.

I have examined carefully, the only case, either in England or in the United States, relied on by counse for Mr. Richards, namely, *The Mechanic's and Working men's Mutual Savings Bank and Building Association, vs. John Wilcox and others* decided by the Supreme Court of Connecticut, October, 1855, and reported in *Mr. Franklin's* book, already referred to at page 90. It does not militate at all against this case in any particular. The Court conceded that it was apparent that the Legislature intended to authorize an association, formed under the statute, to receive a compensation in addition to the legal rate of interest, for a loan of money made to one of their members; that is, a bonus in addition to the legal rate of interest. Nor would the Court, on that account, have set aside the transaction. The Court put its judgment upon the ground, that the terms imposed on the borrower were not authorized by the charter, and the departure consisted in this: That the charter which authorized a bonus on a loan, required that all the bonus should be taken at once, so that the party who borrowed might then know what he was paying. That while he borrowed a thousand and had to pay a bonus of 20 per cent., or in other words, to return two hundred, he would know that he got but eight hundred dollars, whereas, in the case before the Court, the association had made the bonus payable in three-fourth per cent. monthly installments, which the law did not authorize.

Thus it will be perceived, that the Bibb County Loan Association, did, as a matter of policy, just what the Connecticut Court say ought to be done. Mr. Richards paid the whole amount of the bonus at one time. This was one of the conditions upon which he took the loan, if he had it at all. Thus he could see the character of the transaction and judge of his ability to borrow money upon such terms. The money that he might borrow, would be worth lawful interest, it might be supposed, to him, or any one else, and he could determine for himself whether he could so invest it as to afford to pay a bonus for it, and how much. The policy of these

associations, no doubt, is to allow the lender to charge the borrower something for the *accommodation*, while he is only considered as paying legal interest for the use of the money.

I am not prepared to justify even this policy. I believe, myself, that the whole subject demands that legislative enquiry which it has not hitherto received; in order that, if there be no corrective for past inadvertences, the system may be so supervised as to prevent peril and mischief for the future.

Perhaps the best argument in support of this transaction, is the risk and uncertainty attending the result. Stock is put up at auction, the terms of sale are distinctly understood and a sale and purchase is made, taking into view all the contingencies attendant on the society, whether of prosperity or adversity, during the few or many years of its existence. The stock may be worth a premium, or it may be a dead loss at the end of the operation. This, each must decide for himself. If he concludes to take half now for them, that is, one hundred dollars for stock now, nominally worth two hundred dollars six, eight or ten years hence, who has any right to say he judges foolishly? So on the part of the association, they run the hazard of losing all. The debts of the concern may absorb all their funds, including Richards' bond and mortgage, so that installments paid in, out of their private funds, and paid to Richards for his worthless stock, in advance, and the six per cent. additional installment, is a total loss, not only to the body corporate, but to each individual member.

It will be seen by the constitution and by-laws, there are various and uncertain sources of revenue and profit as well as causes of loss. It may so happen, and that from the provisions of the by-laws, that in one year after Richards gets his advance, the association is enabled to pay each stockholder $200 in full and close. In that event Richards' advance would be little less than a gratuity, after deducting one or two annual installments of six per cent, the balance he pays not

Bibb County Loan Association vs. Richards.

a cent for; say he purchases an advance of one share, at a premium of one hundred dollars, he receives one hundred, and has paid two installments of twelve dollars, making twenty-four dollars, which deducted from one hundred leaves seventy-six dollars, for which he has never paid a dollar; and such is the result, if for any cause, the association comes to an end—for it will be remembered that he is bound to pay nothing but installments, and these only so long as the association exists. Who can say, therefore, that such installments will amount to more than the advance he received, with lawful interest. The time and amount of his ultimate payments, depend upon so many contingencies, that it is utterly impossible for any arithmetical skill, indeed anything short of absolute perscience, to foretell the result.

But I forbear to press this examination, but recur to the two questions originally propounded, and that is, first, did the charter authorize the contract from which Richards seeks to be relieved? And secondly, is the act of incorporation itself constitutional and valid?

It is unnecessary to discuss the first point. It is not disputed, but that the advance was made, and the bond and mortgage taken in strict accordance with the constitution and by-laws of the association. These sanction the transaction; and their terms have been rigidly pursued. For failure to do this, as we have seen, was the Connecticut case decided against the association. No one will deny but that it was competent for the Legislature to grant to this or any other corporation, the privilege of advancing money to its own members, at usurious interest. Has the general assembly done this?

This association had already been incorporated by the Inferior Court of Bibb county, under the act of 1843, and the act of 1845, amendatory thereof, Cobb 542 543. But not satisfied with this, they obtained from the last Legislature a confirmatory act, which is as follows: "That Azel R. Freeman, and others, naming them, their successors and assigns,

be and they are hereby made and created, a body politic and corporate, for the purposes of their association; and under, and according to the constitution and by-laws, heretofore adopted by them, to be known &c." And by the fourth section, it is further enacted : "That all the transactions of the said Bibb County Loan Association, had by and with the members thereof, whilst acting under and by virtue or the authority of the Inferior Court of said county, incorporating the same according to said constitution and by-laws, be and they are hereby declared and made valid, and binding in law." *Pamphlet Acts* 432. The ground taken by counsel for Richards is, that in as much as the constitution and by-laws of the association are not embodied in the act, but adopted by reference merely, that they were not read three times, and on three separate days, in each branch of the General Assembly, before the act was passed, as required by the 17th section of the first article of the constitution, and that consequently the act is void. I remark, the act itself was read as required by the constitution. At any rate, nothing is alleged to the contrary. It does not appear, but that the constitution and by-laws of the association, were also read simultaneously with the statute on each separate day, and in each separate branch of the Legislature. The fair presumption in favor of a co-ordinate department of the government is, that they were. Certainly the Legislature acted intelligently in the matter, and perfectly understood what they were doing.

Be that as it may, the Legislature knowingly or otherwise, did incorporate this association, as they have done some sixteen others in the State within the last few years, by their constitution and by-laws. Could they do this ? While I may question the wisdom and prudence of this species of Legislation, I do not for a moment doubt its validity ; should the Court hold otherwise, no one can foresee the consequences that would follow. It is a leap in the dark, which I for one, am unwilling to take ; set aside this charter upon this ground, and hundreds of acts coming down from 1777, to the

present time, and under which the most important rights have sprung up, would have to be declared void. There has not, I venture to say, been a session of the Legislature when similar statutes have not been passed. Not only acts and by-laws of commissioners, and other associations of men in the various counties, clerks and sheriffs and other officers, but also defunct and expired laws, the laws of England, void deeds and other contracts deeds, destroyed &c., have been renewed, sanctioned, adopted and declared valid and binding, without incorporating such acts, laws, by-laws, contracts and deeds in the statute. It is enough, so far as the law is concerned, that it can be made certain." *Id certum est quod certum reddi potest,* is a maxim alike applicable to statutes as to judgments; deeds and other acts of men, as well as contracts and wills, often require parol evidence to execute them. An act grants a right of ferry to a corporation and natural person. There are two or more of the same name in the same place, claiming the franchise *aliunde,* proof alone can solve the difficulty.

Suppose the Legislature were to adopt the Bible as a part of the law of the land. Would the act be void, unless the whole of the Old and New Testament were embodied in the statute ? Suppose it were to declare that the levitical degrees as set forth in the Old Testament should fix the relationship, within which marriage might or might not be contracted ? Or suppose it were to say, that Mr. Greenleaf's Treatise on Evidence should be the guide of the Courts in settling the rules of the testimony. It is needless to multiply illustrations. The position is untenable and impracticable, our Legislature has by one sweeping act, declared the whole of the ordinances of one of our cities valid and of binding force. These ordinances fill a volume of some five hundred pages, and yet it is probable that not one of them was read, certainly not one of them is inserted in the amendatory act. In glancing over the pamphlet of the last session, for different objects, my eye rested on an act, directing the Ordinary of Talbot

county, to pay Wm. L. Owen, two accounts for teaching poor children, *which were filed in the Ordinary's office, of Talbot county,*

Set aside this charter and you eviscerate the Digests' and Statute books of the State. Nay, more ! you annul unquestionably, the adopting act of 1784, and with it go the common and statute law of England, heretofore of force in this State. And after all, these charters are private affairs, binding alone between the members, and not affecting the community at large, but in a single instance, and that is, when the funds of the association remain unproductive and uncalled for, for the space of one month, the directors are authorized to loan what may be on hand to others than stockholders, if it be safely invested and repaid in one year. At any rate, does it lie in the mouth of Mr. Richards' who as a member of this association, asked the Legislature to sanction their constitution and by-laws, to repudiate the act, after having received its benefits, under the pretence that his contract with his fellows was not read three times in each House, for the edification of the members. Of course the principles of this case apply equally to the Macon building and Loan Association incorporated 7th February 1854, *see pamphlets* 378–'9.

BENNING, J. concurring.

Were the charters of these two associations valid ?

If they were, a new trial ought, as a matter of course, to be granted ; for, in what the associations have done, they have only followed their charters.

The charters were valid if the acts of the Legislature referring to them were valid. One of these acts was as follows: "That the members of the Macon Building and Loan Association, of the city of Macon, their successors and assigns, be and they are hereby, made and created, a body politic and corporate, for the purpose of their association, and under the constitution and by-laws heretofore adopted by them, with

power to sue and be sued, and to make and adopt all such rules and regulations, and amendments of their said constitution and by-laws as they may deem advisable, with power to receive and hold and dispose of any and all property, conveyed or mortgaged as security for any loan or debt; and no member of said association shall transfer any portion of his or her shares or interest therein without consent of the directors, unless all debts and loans due from him or her shall be paid. *Acts* 1854, 379.

The other of the two acts was the same as this, *mutatis mutandis*. *Acts* of 1856, 432.

Were these two acts valid? It was said that they were not, and for two reasons.

1st. That the constitutions to which they refer had not been read three times along with them in the Legislature.

2d. That they had to depend for their application to their subjects, on parol evidence.

But those constitutions do not make any part of the acts. The acts are *entire* without the constitutions. One writing may refer to another, without making that other a part of itself. A writing may refer to an object other than another writing, as a man, or a lot of land. In such a case it is *impossible* that the objects can become a part of the writing. If the object referred to be a writing, there does not exist this, impossibility, it is true; but then, neither does there exist any necessity that the writing referred to should become a part of the writing that refers to it.

Again, if we say that an act of the Legislature referring to another act, or other thing in writing is void, provided the thing referred to be not read three several times with the act, we shall have to say that many acts, and some of them very important ones, are void.

Take the adopting act of 1784. That act adopts a great number of statutes, British and Colonial, to say nothing of the whole body of the "common law;" and does so merely by referring to them, and that in a way painfully general.

Not one of the adopted acts was read three times in the Legislature at the time when the adopting act was on its passage. The constitution of 1777, equally with the present constitution, required "all laws and ordinances" to "be read three times." *Walker's Dig.* 9.

It is not one time in many that, in an amending act, the amended act is recited verbatim, and therefore not one time in many, that the amended act is read three times.

There are many acts referring, in a general way, to the charters, and the ordinances of municipal corporations; there are acts referring, in a general way, to deeds, grants, assignments, registrations. It is useless to go further in this direction. The consequence of holding these two acts void because the constitutions to which they refer, were not read three times in the Legislature, would be serious.

Parol evidence is admissible, in order to apply a statute to its subject, in the same way in which it is admissible to apply any other writing to its subject. This is a doctrine of necessity. Suppose a statute be passed in favor of John Smith, soldier. Is not evidence of any sort admissible on the question, whether the claimant under the act is the right John Smith?

I think the two acts were constitutional.


McDonald, J. dissenting.


Alexander Richards, on the 20th day of June, 1854, executed a mortgage to William S. Williford, Treasurer of the Bibb County Loan Association, on certain real estate in the city of Macon. The mortgage recites that the said Richards had, according to the constitution and by-laws of said association, procured an advance and *borrowed* from said association the just and full sum of two thousand dollars.

On the day of the date of the mortgage, Alexander Richards assigned to the mortgagee ten shares of the capital stock of said association as collateral security, to pay the said mort-

gage, and executed a bond on the same day, to the said mortgagee, in the penalty of two thousand dollars, to be void on the payment by said Richards to said association, so long as it should continue to exist, the sum of ten dollars monthly, on its regular day of meeting, being instalments due on said stock, on which an advance was to be procured, and ten dollars monthly, as aforesaid, on the same day, as interest on said advance.    The condition of  the mortgage  is, that if the mortgagor, his heirs, executors, administrators or assigns shall pay to the Treasurer of the association, his successors in office, and assigns, the sum  of ten dollars monthly, on the regular day of the meeting of  said association, being instalments on ten shares of stock in said  association, on which he has procured an advance as aforesaid, from said association, so long as said association shall continue to exist; and the further sum of ten dollars, monthly as aforesaid, on the same day, as interest on said advance, according to the tenor and true intent and meaning of his bond, bearing even date with the said mortgage, and  in accordance with the constitution and by-laws of said association.    A petition had been filed to foreclose the mortgage, to which the defendant filed two pleas: 1st, That the mortgage and the bond it was given to secure were founded on an usurious consideration.    2d, That the plaintiff was not a corporation.    On these pleas the case came on to be heard, at November Term, 1856.    The cause was submitted to the  presiding Judge for his decision, without the aid of a jury, upon a statement of facts agreed upon by the parties.    After  reading the petition, rule nisi, mortgage, bond and transfer, the plaintiff gave in evidence, a printed copy of the constitution and by-laws of the association, sworn to be such by William S. Williford, Treasurer of the association; and it was agreed that the said copy was a copy of the original constitution and by-laws of said association, and that it was organized as therein set forth, prior to their application to the Inferior Court for a charter under the general Act of the Legislature, authorizing such proceedings;

the certificates of the Treasurer showing the several advances received by the defendant *from both societies*, and also as to the average rate of premium bid for advances in both societies from their date to the 20th November, 1856; also the record showing the petition to, and the order of the Inferior Court granting the charter.   The constitution and by-laws of the association were printed by its order, and a copy was furnished to each of its members, and to the defendant among them, and a copy was furnished to the defendant before he signed the constitution and by-laws.   There were three certificates of the Treasurer before the Court.   The first shows that the average premium paid by members of the Macon Building and Loan Association for advances made to them from its commencement to the 3rd November, 1856, was 46 3-16 per cent., and by members of the Bibb County Loan Association from its commencement to 20th November, 1856, an average of a fraction over forty-eight and three-eights per cent.

The second certificate shows, that on the 15th of June, 1854, Alexander Richards had subscribed in the Bibb County Loan Association, under the constitution, for forty shares of the stock, that on the fifteenth of June, he took an advance of $2,000 at 51 1-4 per cent. premium, that $1,025 were retained as premium and $975 paid him in cash ; and by the 18th of January, 1855, he had received $8,000 of advances, on which the cash paid to him was $3,528, and cash retained as premium was $4,471 50, and that he had paid by the 18th of October, of the the same year, $1,159 instalments and interest.   The Inferior Court of Bibb County passed the order of incorporation on the 10th day of June, 1854.   It is not stated in the record how long previously thereto the association had been organized.   On hearing the arguments in this case, the Court passed an order, that each and all of the defendant's pleas be sustained.

The record sets out more fully the decision of the presiding Judge, and shows that he decided :

1st. That the Bibb County Loan Association is not a partnership.

2d. That neither the act of incorporation granted by the Inferior Court of Bibb County, nor that granted by the Legislature of Georgia, authorized said association to advance or loan money to its members under, and according to the constitution and by-laws of said association, because, in the judgment of the Court, they constituted no part of either of said acts.

3d. That the advance to defendant to secure which his bond and mortgage were given, was a loan of money by said association to said defendant at an usurious rate of interest, to-wit: at a rate of seven per centum per annum, in violation of the statute against usury. The judgment of the Court was that the plaintiff recover of the defendant, the amount only actually advanced to him, to-wit: nine hundred and seventy-five dollars, less the amount the defendant had actually paid plaintiff as installments, and interest under and by virtue of the bond and mortgage. There is but one sweeping exception to the "rulings" of the Court. The majority of the Court are of opinion that the decision of the Court below was wrong, and reverse it. I am of opinion that it was right, in the main point especially, and that the judgment he rendered in the case was in accordance with the law. I shall proceed to assign my reasons.

According to the view which I take of this case, it is not material whether the Bibb County Loan Association be a partnership or not. In either case the presiding Judge had a right to draw his own inference as to the intention of the parties in organizing it, and contracting as they did. I will remark, however, that if it be a corporation, and it had authority to make such contracts, under the charter, there being no lack of constitutionnl power in the Legislature to grant such a charter, with the powers which the association exercised in this case, the contract is lawful and ought to be enforced. If the contract be authorized by the charter and the

charter be constitutional, and its provisions come in conflict with the statute against usury, even if the latter statute prohibited it, the contract is lawful, for, as to this institution, the law agaist usury in that case, would be repealed.   But if the association be a partnership and not a corporation, the contract is usurious.   A partnership has no more right or authority to violate the statute against usury than an individual, and whatever would amount to usury in the contract of an individual, would be usury in a contract made by a partnership.   Our statute against usury declares that no person or *persons* whatsoever, shall take directly or indirectly, for loan of any monies, wares, merchandise or commodities whatsoever, above the value of eight pounds for the forbearance of 100 pounds for a year, and so after that rate for a greater or lesser sum, or for a longer or shorter time; and that all bonds, contracts and assurances whatsoever, made for the payment of any principal or money to be lent, covenanted to be performed upon, whereupon or whereby there shall be reserved or taken above the rate of eight pounds in the hundred, shall be utterly void.   *Prince* 294.

In order to render a contract usurious three things must concur:

1st. There must be a loan either express or implied.

2d. There must be an understanding that the money lent shall be returned at all events.   *Comyn on Usury*, 156.

3d. There must be an understanding, not only that the money lent shall be returned, but that for such loan a greater interest than seven per cent. shall be paid.

It is insisted by the plaintiff in error that there was no loan to Richards, but an advance upon his stock as purchase of a portion of his interest in the partnership. The title of the association is evidence of its purpose and interest. It is the Bibb County *Loan* Association. If a stockholder who has received any portion of his stock in advance, neglect or refuse to pay any or all of his dues to the association, for three successive months, the directors may compel payment of *principal* and

interest, by instituting proceedings on the bond and mortgage, according to law. § 7, *Art.* 8 *Constitution.*

The mortgage recites that Richards had procured an advance and *borrowed* from the association two thousand dollars. The terms "advanced" and "borrowed" are used as convertible terms. The stock is transferred as collateral security to pay his *bond* and mortgage. The penalty of the bond is two thousand dollars. In some sections of the constitution the person taking an advance, as it is called, is spoken of as having purchased an advance upon his stock, which implies that he is still the owner. In another section this expression is used, "should any stockholder, having received any portion of his stock in advance, neglect or refuse," &c., which implies that instead of purchasing an advance of the stock, the association had purchased up his stock. I have referred to the constitution, mortgage, bond and transfer sufficiently to show that it was a loan to Richards of the amount that he received. It is called an advance, a purchase, a receiving his stock in advance, it is spoken of as a loan, the *principal* and the *interest* is spoken of, and the mortgage recites that he *borrowed.*

There is an undertaking that the money shall be returned at all events. The bond and mortgage are given for what is called an advance on ten shares of stock. On this advance, although he has transferred to the association the ten shares, he is to pay monthly, as installments, ten dollars as long as the association continues to exist, and ten dollars monthly on the same day, as interest. As the shares of stock are transferred as collateral security, that is the contract, he is entitled to the dividends, or in other words, the association is bound to apply them as they accrue, in payment for the stock which they hold. When each stockholder for each and every share of stock held by him, shall have received two hundred dollars, then the association shall determine and close. The association claims to hold the transferred shares as collateral security only. They are nominally Richards' shares, to preserve the

vitality of the partnership, as we are now considering it, until he receives two hundred dollars on each share, by his own payments of installments, and the accrual of his dividends, but really, they belong to the association until the full amount of $2,000 dollars is paid, and he pays also the interest on that sum at six per centum per annum.    The money, then, is to be paid at all events.

That there was an understanding that, on the loan, a greater sum than seven per cent. interest is to be paid, is apparent in the evidence before us, most palpably.    The record states that Richards received an advance of $2,000, on the 15th day of June, at a premium of 51¼ per cent., that the association deducted $1,025 for this premium and paid him $975, net cash, as it is called in the record.    So that Richards received $975 in money.    He was to have it at 51¼ per cent. premium.    He gave his bond and mortgage for two thousand dollars, which makes the premium on the sum actually received by him amount to a fraction more than $105 128–975 per cent.    By the third section of the eighth article a stockholder taking an advance, is to allow the premium offered by him to be deducted.    That is, instead of receiving the $2,000 and giving his note, or otherwise receiving the premium, it is to be discounted, and he takes a sum which, with the premium added thereto, at the rate bid, will make the sum purchased. According to the terms of this contract, therefore, Richards ought to have received $1,322 31–100, and a fraction over. He agreed to pay, additionally, six per cent. on the $2,000 ; more than 12 per cent. on the amount received, and besides all this, he paid the expense of examining his title to the property mortgaged, &c.

If this association was gotten up for the purpose of loaning money at usury, and the plan of effecting this was a contrivance to evade the usury laws, the association, as a partnership, is illegal, and its contracts cannot be enforced.    It is not necessary, however, to go into that question here.    It is

not made in the record, and the decision of the Court below was, that it is not a partnership.

It was insisted in the argument before us, that this contract is not usurious, because the transaction is analogous to post-obit contracts, which, it is said, are not usurious. They are not necessarily usurious, but they may be, and they may be enquired into. In the case of *Scott vs. Loyd, 9th Peters,* 445, Chief Justice Marshall says, "that the purchase of an annuity or rent charges, if a *bona fide* sale, has never been considered usurious, though more than six per cent. profit be secured. Yet it is apparent that, if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter. Courts therefore, perceived the necessity of disregarding the form, and examining into the nature of the transaction. If that be in fact a loan, no shift or device will protect it." This association, as ingeniously guarded as it is, in its several points, by having them so adjusted and put together, that decisions of the Courts on special cases may be invoked to protect it against the charge of usury in its transactions, to contract with one of its members, is nevertheless open to investigation; and if in the judgment of those whose duty it is to pass upon it, on the evidence, the whole matter was a scheme to evade the law of usury, or that a contract for an advance was no more than a loan, and its being put in that form was a device only, for the same purpose, it cannot stand. "To them that lend money," says Lord Cope, "my caveat is, that neither directly nor indirectly, by art or cunning invention, they take above ten (seven here) in the hundred; for they that seek, by slight, to creep out of these statutes, will deceive themselves and repent in the end." *Co. Lit.* 4 *a.* If the object be to lend for usurious interest, and that object can be established either from the contract itself, or by extrinsic evidence, the contract cannot stand as made. It must yield to the operation of the law. If in a partnership, a loan at usury is made to a member of the firm, under cover of an advance upon his interest in the

concern, if proved, it can no more stand than can a loan to a third person. Is it a lending? is it usurious? are the questions.

The case of *Silver vs. Barnes*, 37th *Eng. Com. Law Rep.* 335, is referred to as an authority that it is not a lending, therefore not usurious, that it was a dealing with the partnership fund, that the defendant had an interest, and that it was not a loan, and it seems to go to that extent. But that case also settles that whether it was or not, was a question proper for the jury, and that the Judge who tried it properly left it to them. It is clearly inferable from the case that if the jury had found the note there to have been usurious, the Court would not have disturbed the verdict. But that case is not law in this State. The law against usury is virtually repealed by that decision, and lenders of money in England and elsewhere, where that authority is respected, who have been most studious of devices to evade the statute against usury, have in that decision, a license to set it at naught.

If a jury had been empannelled in this case, and the presiding Judge at the trial, had summed up the evidence to them, precisely as it is stated in this record, giving no opinion to them as to what had been proven, and keeping strictly within his province under the statute, and had simply referred the question to them, whether the contract was a lending, and whether the plan adopted to make the loan, if a loan, was a device to evade the usury laws, and if it was, the contract was void, except as to the sum of money actually advanced, and the jury had found it to be a lending and usury, the Court could not have felt itself authorized to set the verdict aside, as being contrary to either law or evidence. By the consent of parties, the Judge in this case, became the jury, as well as Judge, and as such he had a right to pass judgment on the intent of the parties, and, therefore, under the partnership aspect of the case, the judgment ought to stand. *Jackson vs. Christman*, 4 *Wendell*, 283.

I will now proceed to consider the case under the charters

which, the association claims, erect it into a corporation. The Legislature, in December, 1843, passed a general act incorporating companies in advance. This act was amended in 1845. The first act confined itself to a certain specified class of corporations. The second act extended it to all kinds except Banks and insurance companies. By these acts persons who desired to have themselves incorporated for any purpose, with the above exceptions, are required to petition in writing the Superior or Inferior Court of the county where the association may be formed, or desire to transact business, setting forth the object of their association, and the privilege they may desire to exercise, together with the name and style by which they desire to be incorporated. The act requires the Court to which the petition is made, to pass a rule or order directing it to be put on the minutes of the Court. The act then incorporates the petitioners with power to use a common seal, to contract and be contracted with, to sue and be sued, to answer and be answered unto in any Court of law or equity, to appoint such officers as they may deem necessary, and to make such rules and regulations as they may think proper for *their own government*, not contrary to the laws of this State. They are restricted from making contracts, purchasing or holding property of any kind, except such as may be absolutely necessary to carry into effect the object of their incorporation.

The petition must set forth the object and privileges of the corporation, for if they are not found there they do not have them. The Courts have no authority to *grant* a charter. Their power begins and ends with hearing the petition, and directing it, by rule or order, to be put on the minutes of the Court. The order of the Court, in this case, contains a grant, but that does not vitiate it. The petition was ordered to be recorded. The balance of the order is merely surplusage and void.

The petition, then, must be referred to for the power and faculties desired by the association, and the act must be look-

ed to, and by an examination of its provisions, it must be determined to what extent these powers and faculties are conferred. The privileges the petitioners ask for are:

1st. To accumulate a fund by the monthly subscription or savings of the members.

2d. By means of this fund, to procure for themselves such real estate as they may deem desirable.

3d. To conduct the association, in the way such associations, (to wit: associations to accumulate funds to buy land,) are usually conducted.

4th. That they may be incorporated for the said purposes under the constitution and by-laws theretofore adopted by them, and to make and adopt all such rules and regulations and amendments of their said constitution and by-laws, that they might deem advisable, not conflicting with the laws of the State.

5th. To have power to receive and hold and dispose of all property conveyed and mortgaged to said association, as sesurity for any loan or debt, according to the statute in such cases made and provided.

There is nothing in the statute to prohibit them from accumulating a fund, and the statute is the law of their organization as a corporation, from the monthly savings or subscriptions of its members. But to procure or purchase with the fund thus accumulated, such real estate as the association may deem desirable, is prohibited by the act incorporating companies in this manner. It declares expressly, that corporations created by that act, shall make no contracts or purchase, or hold any property of any kind, except such as may be absolutely necessary to carry into effect the object of its creation. The object of this prohibition was to prevent the accumulation of money to monopolize property of any kind. It need not be said that the object is to collect together funds, to be disposed of to individual stockholders, on better terms, than they could be obtained elsewhere, for the purchase of real estate for themselves individually. It is not so expressed.

The constitution of the association does not so provide. What is acquired under the charter, must be acquired as corporate property. The constitution and by-laws of the association, which came up with the record, and which they claim to contain the powers of the corporation, show, that it is any thing else but a corporation to aggregate a fund from the savings or subscriptions of the stockholders to purchase land for the benefit of individual members of the association. The case before us is a pretty good illustration of its workings, purposes and objects, to wit: to loan money to the members on the hardest terms, impose on the unfortunate note borrower, all the expense incident to securing the money loaned, and requiring of him security, ample security on real estate, by mortgage for the amount he receives, prosecute his mortgage when he fails to pay, and wind up his affairs, and in this manner acquire his real estate, or such part thereof "as they may deem desirable." This is the mode of "procuring" real estate for which the constitution and by-laws provide. The charter is explicit. It declares that it shall hold no property, except such as may be absolutely necessary to carry into effect the object of their incorporation. The exception specifies the extent of their authority to hold real estate or any kind of property. If it be a corporation to manufacture, it may purchase real estate sufficient for the buildings, houses of the operatives, &c., teams if it require them, &c. If the corporation were to take a mortgage on any kind of property to secure a debt to it, and on the foreclosure, it should become the purchaser to pay its debt, it would not violate the prohibition, unless it continued to hold on to it, under circumstances, which showed that the corporation had resorted to that proceeding as a cover for obtaining property in contravention of the charter. In ordinary cases, if a corporation subject to the same prohibition were to do all this, it would be a question whether it could be made a ground of defence by the party who executed the mortgage, or whether the State alone could use it on a proceeding for the forfeiture of the

charter. The mortgagor certainly could not avail himself of such a defence, until by the practices of the association in thus *acquiring and holding* property, it had gone through the process of lending, taking mortgages, foreclosing and purchasing, as a means of obtaining property, to such an extent as to amount to a violation of its charter, and then it is extremely questionable. But aside from all this, the powers exercised by this corporation, are under its constitution and by-laws, and not under the charter. The constitution authorizes the sale of advances on stock to the highest bidder, which I have shown is only a lending at usurious interest or at least it was so in this case. Such a lending is contrary to the laws of this State; and the rules and regulations which authorize it, are cantrary to the laws of this State, and under the act of the Legislature, are no rules or regulations. When the petition was presented to the Inferior Court, they had a right to presume that the petitioners had not run counter to the laws of the State in adopting their rules and regulations.

But there is another grave objection to this charter, even if the constitution and by-laws, or their rules and regulations are a part of it. What powers does the corporation possess, regarding it in this light? The rules and regulations show how persons may become stockholders, how the fund shall be raised and how it shall be disposed of. The fund when raised is to be *advanced*. The advance is to be made to him who bids highest. The price bid is to be deducted from the advance, and then interest, at six per cent, is to be paid on the aggregate of the advance and the price paid for it, which is called the premium. This is a loan and nothing else. The *borrower*, for he is so styled, executed a mortgate to pay his installments on the stock, and the interest, the corporation collecting the dividends, as they accrue, and this must continue until the advance and premium are both paid, which pays the money loaned and the usury. This is the sum of the powers of the corporation, and what does it

amount to ?   It is a bank.   There are three kinds of banks, to wit: banks of deposit, banks of discount, and banks of circulation.   This association, by whatever name it may be called, is a bank of discount.   Its name, however, is appropriate to such an institution.   " The Bibb County *Loan* Association."   The act grants no charter to such  institutions. On the contrary, it specially excludes them.   Hence, I think, first, that the association can exercise no powers as a corporation, under the order of the Inferior Court, and second, that if it could, the rules and  regulations being contrary to law, under which it claims to be a corporation, are void.

It is insisted, that if this advance, mortgage &c. be void under the order granted by the Inferior Court, the act of 5th of March, 1856, makes them valid. *Pamph.* 431.   That is an act whose caption is to incorporate the LaGrange Light Guards, the Bibb County Loan Association and the Screven Troops, *and for other purposes.*"   There is not a word in the caption which points to the section which legalizes the transactions of the association while acting under the charter derived from the Inferior Court.   It is one thing to incorporate a company, and quite a different thing to legalize the illegal acts of  the persons composing that company, done prior to their incorporation.   The  third section of the act completes the incorporation of the association.

If while under consideration in the Legislature, a member had called for the reading of the part of the act  designed to incorporate the association, the reading of the  third section would have satisfied the call; and so in regard to the part incorporating the La Grange Light Guards, and  the Screven Troops.   The Legislative confirmation of illegal acts committed by persons ,praying a charter and then incorporated, prior to their incorporation, is no where indicated in the title, and that confirmation is, therefore, "matter different from what is expressed in the title of the act."  The phrase "for other purposes," does not satisfy the Constitution.   The Constitution is the work of the people, and every part of it should be

observed and be given full effect to, as having been design-ed for some valuable object and no part of the Constitution should be more strictly regarded than that which is intend-ed to protect the people against impositions and frauds meditated upon their Legislators. This provision of the Constitution was intended to call the attention of Leg-islators to the matter presented for their consideration by the simple reading of the caption of the bill, at the clerk's table. The history of this provision in the con-stitution, is referred to in the case of the *Mayor and Alder-men of Savannah vs. the State of Georgia,* 4 *Georgia Reports* 38, and I have no doubt, as there stated, that its necessity was suggested by the Yazoo Act. It is not to be found in the older Constitutions. The title of that famous or rather infa-mous act, *(Watkin's Digest,* 557, was " An Act supplemen-tary to an act entitled 'An Act for appropriating a part of the unlocated Territory of this State, for the payment of the late State troops, and for other purposes therein mentioned,' de-claring the rights of this State to the unappropriatad territory thereof, for the protection and support of the frontiers of this State, *and for other purposes.* " The same expression, "and for other purposes," used in the title of the act, under consid-eration, was used in that act, and the gross imposition prac-ticed on the Legislature in that case, led to the insertion in our present Constitution, of the clause forbidding the passing of any ordinance or act containing any matter different from what is expressed in the title thereof. This point was not very fully considered in the case of *Martin vs. Broach,* 6, *Geo. Rep.* 21. It was not a point in the case, and the Court in delivering its opinion, speaks of it as a suggestion of coun-sel only. An Act entitled " An Act for certain purposes," would be equivalent to an act without a title, and yet it would be as specific as to the object of the act, as the expres-sion and "other purposes," would be of a matter not referred to otherwise, particularly of the title in an act embracing va-rious objects.

It is useless for me to consider this case further, but I will remark in regard to the third section of the act, which incorporates the association anew, that I cannot consider that any power is conferred here to do any act not warranted, or which is forbidden by the general laws of the State. In other words that there is no repeal of any public statute, such as the statute against usury, by this act of incorporation, in favor of the association. The constitution and by-laws, adopted by an association of persons for their own government, in the transaction of any business they may undertake, are never to be presumed to be in contravention of the laws of the land. The business they undertake is presumed to be a lawful business. When the Legislature grants a charter in general terms, "for the purposes of the association" these purposes are to be considered as lawful purposes, and if they are incorporated under a constitution and by-laws, theretofore adopted by them, the Legislature is not to be presumed in granting the charter, to have known what the constitution and by-laws were, but must be considered as having understood them to be a constitution and by-laws to govern the members in transacting the lawful purposes for which they were incorporated. By-laws are private statutes for the government of the corporate body, 1 *Key on Cor*, 69. A by-law cannot be at variance with the general laws of the country, *Grant on Cor* 76. In respect to this corporation, the General Assembly knew that the parties had petitioned the Inferior Court, and claimed to be a corporation under the act of 1843, and that act restricted their power in making rules and regulations for their government to such as were not contrary to the laws of the State, and the Legislature, I must presume, passed the act of 1856, affirming legal by-laws and constitution adopted under that act, and none other. I cannot consent to look into the affirmed antecedent by-laws and constitution, for the corporate powers of the body, any more than I could look into such constitution and by-laws, if subsequently made. They are affirmed as constitution and by-

laws, and are not affirmed as a grant of power or privilege; the affirmation of what was already made, is only equivalent to a grant to make ; and a grant to make a constitution and by-laws, without words of restriction, is not a grant of power to make them in violation of existing law.

What I have said in reference to the charter of the Bibb County Loan Association, is applicable to the Macon Building and Loan Association, as to the powers it can exercise; and as to the validity of those by-laws, which are repugnant to laws of the State. There is not a word in the constitution and by-laws in respect to building. All the energy of the aggregate corporate mind, seems to have been directed to the forming of a plan of operations which would evade the usury laws, and of contriving an expedient, by which the Legislative sanction, and affirmation of the illegal scheme could be obtained. I think it has failed. In a work entitled "Systems of Building Associations examined," there is much useful information. It shows the origin of the institutions. That they were projected at first for the laudable object of aiding the poor in providing for themselves comfortable homes ; but it was soon discovered how they might be made instruments in the hands of capitalists of increasing their wealth by oppressing the poor. I am sorry to say that they never found their way here until they had been in other places perverted to this wicked purpose. It is clear that the man of large means, who is a member, never borrows ; while the man in moderate circumstances does. The author of the work I have referred to, denominates those who take no loans, *accumulators,* and those who do, *borrowers.* The accumulators, he says, no less than the borrowers share in the profits of the institution, but contribute nothing to produce them, *page* 4. He says, at *page* 14, that in Connecticut, the system has induced a practice which has subverted the purpose it was designed and calculated to fulfill; it has been turned into an instrument of gain, by those who had no need to share its benefits, and been made to oppress those whom it was de-

signed to relieve and assist." For the reasons then,

1st. That the whole question was submitted to the presiding Judge, by consent, and that from the facts submitted to him, he had the right to infer, that it was the intent of the party to loan at usury; and it did loan at usury:

2d. That, considering the associaton a partnership, the transaction was not necessarily not usurious, but whether it was or not, was a question of intent upon the agreed facts, which the Judge had as much right, under the agreement of the parties, to find, as jury:

3rd. That for the reasons assigned, I think his inference of intent from the facts was right:

4th. Regarding it as a corporation deriving its authority under the Act of 1854, and the act amendatory of it, for the many reasons herein set forth, that it had no power to lend money at all, and that the by-laws cannot be considered as a grant of power:

5th. That the act of 1856, so far as it affirms the acts and transactions under the proceeding of the Inferior Court, and its constitution and by-laws, is unconstitutional and void:

6th. That the act of 1856 passed subsequently to the whole transactions cannot aid them, and that that act contains no grant of power to lend money at a rate above seven per cent: I am of opinion, that therefore, the judgment of the Court below ought to be affirmed.