## WHEELING.

PARKER et als. v. UNITED STATES BUILDING, LAND AND LOAN ASSOCIATION et als.

Submitted June 7, 1880. Decided May 6, 1882.

1. By the 27th section of chapter 54 of the Code of West Virginia, page 411, it is provided, that "Every homestead and building association is authorized to levy, assess and collect from its members such sums of money by stated dues, fines, interest on loans advanced, and premiums bid by members for the right of precedence in taking loans, as the corporation by its laws shall provide : *Provided,* That the dues, fines and premiums paid by the members of such corporation, although paid in addition to the legal rate of interest on loans taken by them, shall not be construed to make the loans so taken usurious :" HELD,

Upon the redemption of shares under this section by a building association the premium bid by a member must be regarded as the amount, which he proposes and agrees to have abated from the par value of his share at the close of the association, if the precedence in taking the loan is awarded to him, and not as the cash, which he is willing to pay for such precedence. The loan advanced under this section is the money actually paid by the association to the member, whose shares are redeemed, and not the par value of the shares redeemed; and therefore the association has no authority under this section to take or demand interest on the par value of the shares redeemed. If it does so, it violates the statute against usury and is not protected by the proviso in this 27th section, and it can only recover the interest on the money actually advanced and paid to the member; nor would a provision in the constitution however express or the consent of the member to pay interest on the par value of the shares and to regard his bid of the premium as a cash-bid alter the case ; for the association is not permitted by this section to take interest on anything but the money actually paid to the member for his own use. (p. 777.)

97

2. A deed of trust taken to secure such a loan may also properly secure the payment of the dues, fines and charges against a member arising from his ownership of the shares redeemed and also the repayment of any taxes or insurance on the property conveyed by the deed of trust, as these provisions are necessary to render the property conveyed and the stock redeemed available security. The stock redeemed is to be regarded not as belonging to the building association but as pledged as collateral security for not only the actual loan and interest thereon but also as security for the premium bid, which is to be abated from the par value of the stock at the close of the association. (p. 784).

Appeal from and *supersedeas* to a decree of the circuit court of the county of Ohio, rendered on the 17th day of May, 1879, in a cause in said court then pending, wherein John E. Parker, Joseph N. J. Parker, and Simon P. Parker were plaintiffs, and the United States Building, Land and Loan Association and others were defendants, allowed upon the petition of the said plaintiffs.

Hon. Thayer Melvin, judge of the first judicial circuit, rendered the decree appealed from.

GREEN, JUDGE, furnishes the following statement of the case :

John E. Parker, Joseph N. J. Parker and Simon P. Parker partners under the name of Parker & Brothers were stockholders and members of the United States Building, Land and Loan Association, a corporation organized under chapter 54 of the Code of West Virginia in part for the accumulation of a fund, by which the members shall be enabled to build and to secure loans. The number of shares held by them varied from time to time. They had at first one hundred shares of the stock, of which on April 6, 1875 they withdrew under a provision of the constitution fifty-six shares and paid the association therefor $308.00. The remaining forty-four shares held by them were afterwards increased to seventy-one shares, they acquiring at different times twenty-seven additional shares. The par value of the shares was $150.00 a share. On December 1, they redeemed forty shares of their stock at premiums varying from 36 to 40⅛ per cent for which they executed to the association seven notes each payable seven years after date with interest from its date payable quarterly in advance. The principal of these notes aggregated

$6,000.00. The amount received by them was $3,686.45. To secure these notes they gave a deed of trust on lots numbered thirteen and fourteen in Centre Wheeling; and the trust stated it was not only to secure these notes but further to secure the prompt and full payment, when due, of each instalment of said notes, the prompt payment of all dues, fines and charges, with which said Parker Brothers may be assessed as members of said association, and the repayment of any and all sums, which the said association may have to pay for taxes, insurance or other charges on said property; and the deed declared, that it was understood and agreed, that the trustees under this deed may sell not only upon default in the payment of the principal of any of said notes, when due, according to its tenor and effect, but also in default of the payment when due, of any instalment of interest thereon, or upon default in the payment by Parker Brothers of any dues, fines or other charges, with which they may be assessed as members of said association, or upon their failure to keep the taxes on said property paid up, or to keep the buildings thereon insured in such amount, as the association should require, the whole of the principal of said notes shall be considered due, and the trustee may sell, although in any such case no part of the principal may be due other than those under the provisions of this deed. The trustee in this deed was W. H. Caldwell. At that time they owned forty-four shares of stock.

On March 9, 1875, they redeemed their remaining four shares. The premium they gave was 38⅔ per cent. They gave their note for $600.00 and received $360.75. And on April 28, 1875, they gave another deed of trust to secure this $600.00 note, and all dues fines and charges, with which they might be assessed, and with the same provisions in it, as have been stated to be in the first deed of trust. The trustee in this deed was W. J. W. Cowden, and it covered two other lots in Wheeling, numbers thirteen and fourteen in Eoff's addition to the city of Wheeling. On February, 22, 1876, they redeemed six shares, which they had just acquired. The premium given for these was 28¼ per cent., and the amount they received was $632.25. They gave their note for $900.00, and secured it by a deed of trust with the same provision as to its being a security also for all dues, &c., and like provision

for selling before note became due or like contingency, as in the former deeds of trust. The property conveyed by this deed of trust was a certain piece or parcel of ground described as in Bushfield and McMechen's addition to Wheeling. The trustee in this deed was W. H. Caldwell. On March 7, 1876, they redeemed fourteen shares at premiums ranging from $31\frac{1}{2}$ to $31\frac{7}{8}$ per cent. They gave their three notes aggregating of principal $2,100.00 bearing interest from date, and received $1,403.06. These shares they acquired just before they were redeemed. These notes were secured by a deed of trust with exactly the same provisions as the others. The property was conveyed by them to W. H. Caldwell, trustee, and was lot number two in square number ten in Gilchrist's addition to Wheeling situated on Wheeling Island. On August 22, 1876, they redeemed seven other shares which they acquired in March and April, 1876. These they redeemed at a premium of $33\frac{1}{8}$ per cent. They received $584.25 and gave their note for $1,050.00, which they secured by a deed of trust with similar provisions as the other deeds of trust. W. H. Caldwell was the trustee in this deed; and it conveyed sixty-nine lots in Parker & Brothers' addition to the city of Wheeling. This deed of trust professes to secure notes of date August 22, 1876, amounting to $2,250.00; but the building association admits it has but this one note of $1,050.00 of that date and that it is the only note secured by that deed. It was then contemplated that a further loan might be made and the deed was drawn so as to include it, if made; but in point of fact it never was made. The plaintiffs were the grantors in all these deeds of trust; and they were all promptly and duly recorded when given.

The payments on account of interest on their notes made by Parker & Brothers up to December 28, 1876 was $762.65, after which time they paid nothing on account of interest, and there was due from them on that account on June 12, 1878, $958.50. They paid their dues as required by the constitution, 25 cents a week on each share, up to July 10, 1877, the payments for dues up to that time amounting to $2,502.75; and after that time they paid nothing on that account. On June 12, 1878, there was due on that account $852.00. They were fined by the association during all the time they failed to

pay according to the construction put on their constitution by the association 10 cents a week on each of their shares or $553.80 from the 28th of December 1876 to the 12th of June, 1878. The total amount claimed to be due by the association was $2,364.60. The association then required said trustees W. J. W. Cowden and W. H. Caldwell to sell under these deeds of trust. After that till the close of the association there was coming due weekly to the association $17.25 of dues, $159.75 of interest each quarter and fines as claimed by the association of 10 cents per share each week or $7.10 in all of fines each week, which by the 11th of December would add to their indebtedness $965.00 or make in all claimed to be due on December 11, 1878, $3,329.90. To this the association claims must be added $18.00, which they were compelled to pay for insurance on buildings, on which they had a deed of trust, Parker & Brothers having failed to pay it when required. This indebtedness would continue to increase, till the association closed, which it was estimated it would do on November 1, 1881, provided the interpretation of the right of the association to collect fines, dues and interest of its members was that insisted on by the corporation, though even then the time would be uncertain. But if they have not a right to collect these fines, interest and dues in full, the time when the association would close its business would of course be prolonged.

On June 13, 1878, W. H. Caldwell by the direction of the association advertised, as required by the deed of trust of March 10, 1876, the land on Wheeling Island conveyed by that deed ; and on July 3, 1878, he advertised under the deed of trust of date August 19, 1876, by like direction the sixty-nine lots in Parker & Brothers' addition to Wheeling. Both sales were advertised to take place July 20, 1878. On July 12, 1878, he was enjoined by an order of the circuit court of Ohio county on an amended bill filed by John E. Parker, Joseph N. J. Parker and Simon P. Parker against the United States Building, Land and Loan Association, W. H. Caldwell, trustee, and W. J. W. Cowden, trustee. The plaintiffs had previously brought their suit in the county court of Ohio county, and it had been regularly removed to the circuit court of Ohio county. The plaintiffs set out the facts above stated

in this amended bill filing with it the several deeds of trust and the notices of sale, and putting on them their version, that these various transactions were so many loans to them at usurious rates of interest. They say, they never signed the constitution of this association and are not members of it; and they charge, that the secretary of the association and other members of it combined to defraud the plaintiffs and make them pay large premiums for the shares redeemed by by-bidding. They ask an injunction to stay these sales, that the association be required to render an account of all sums of money loaned, the date of the loans and amount, and discover under oath, what interest has been paid, that the usurious interest may be applied to the principal due, and that the deed of trust of August 19, 1876, may be corrected and set out the true amount loaned, and for general relief. This amended bill was sworn to by John E. Parker.

On December 21, 1879, the United States Building Association filed its answer. It set out the true state of accounts between it and the plaintiffs according to its view of what was the legal construction of these transactions and filed exhibits with the answer showing these accounts and a detailed and accurate statement of all their transactions and also a copy of the constitution and by-laws. It claims it was a corporation *formed* under the 54th chapter of the Code of West Virginia as a Homestead and Building Association; and that under the provisions of that act it had a right to do what it had done and has not been guilty of usury. It sets forth all the facts as stated heretofore in great detail, avers, that it exacted no usury, as it was authorized by law to do what it did; that it redeemed these various shares of the stock of the plaintiff, he being willing to take off or allow a larger premium than any other stockholder at a public bidding, which was fair, neither their secretary nor any other member of the association combining to run up by by-bidding the premiums alleged to be given by the plaintiffs by their bids. They paid the par value of their stock redeemed by them $150.00 a share and they paid the association the premiums they had bid on them and their month's interest in advance as required by the constitution. The answer alleges that the plaintiffs were members of the association, one of them being a director;

that the notes were taken as additional security for sums otherwise becoming due; and when the dues, interest and fines and sums disbursed for insurance are paid, they will have no claim for these notes. The association does not regard the money as loaned and these notes taken for the loans; but they were taken to secure the payment of the fines, dues, interest and insurance which by the constitution they were bound to pay, after their shares were redeemed or purchased by the association. They ask that the injunction be dissolved and the bill dismissed at the plaintiff's costs. This answer was sworn to by the secretary of the company.

The cause was on January 17, 1879, heard on bill and this answer and on motion to dissolve the injunction; and the court dissolved the injunction. From this decree an appeal has been taken and a *supersedeas* awarded to it by a Judge of this court.

So much of the constitution of the United States Building, Land and Loan Association filed with the bill, as is necessary to understand fully the opinion of the court and the respective rights of the parties, is appended at the close of the statement of the case of *Parker* v. *United States Building, Land and Loan Association* See same *supra.*

The counsel in the case of *Parker* v. *United States Building, Land and Loan Association et als.,* were also counsel in this case and cited the same authorities as in that case.

GREEN, JUDGE, announced the opinion of the Court:

The five different deeds of trust given by Parker & Brothers on various parcels of real estate named in them have all the same character of provisions differing only in the notes secured and the property conveyed as security. They all are on the trusts expressed in the several deeds of trust, to wit: in trust to secure to the United States Building, Land and Loan Association of Wheeling the prompt and full payment of the several notes made by Parker & Brothers, stating their several dates and when payable, with interest from date payable quarterly in advance; and further to secure to the United States Building, Land and Loan Association the prompt and full payment, when due, on each instalment of in-

terest on each note secured in the particular deed of trust, the prompt payment of all dues, fines and other charges, with which Parker & Brothers may be assessed as members of said association, and the repayment of all sums, which the said association may have to pay for taxes, insurance and other charges on the property conveyed by the particular deed of trust. And in each of these deeds is added this clause: "It is understood and agreed, not only that the trustee under this deed may sell upon default in the payment of the principal of any of said notes (referring to the notes secured in the particular deed) when due, according to its tenor and effect, but upon default in the payment, when due, of any instalment of interest thereon, or in the default in the payment by said Parker & Brothers of any dues, fines or other charges, with which they may be assessed as members of said association, or upon their failure to keep the taxes on said property (conveyed) paid up, or to keep the building thereon insured to such amount as the association may require, the whole of the principal of said notes (those secured by the particular deed of trust) shall be considered as due, and the trustee may sell, although in such case no part of any of said notes may be due otherwise than under the provisions of the deed." The dues, fines and charges referred to in each deed of course are to be interpreted to mean the dues, fines and charges arising from the ownership by them of the particular shares redeemed, for the redemption of which the note named in each particular deed of trust was given, and cannot of course be construed as referring to the dues, fines or charges, which might result from the ownership of any other shares, whether owned at the time the particular deed of trust was given or acquired subsequently.

What is really secured by these deeds of trust? That must depend upon the view, which we take of the real character of the transaction between a building association and a member, when a share of his stock is redeemed. Such transaction is not either an advance made to the member of his future profits and a pledge of his shares redeemed for the repayment of the same, nor is it a sale by the member of his share redeemed to the building association, but it is a loan by the building association to him of money, he agreeing to pay a premium

for the preference given him over other members in taking the loan. This was decided by this court in the case of *Pfeister* v. *The Wheeling Building Association, supra.*

We must therefore now consider, what is the amount of this loan. Is it the par value of the share, which the member had redeemed, for which according to the practice of this association in this case it took the note of the member, or is it the actual sum of money, which the building association in point of fact pays to the member ascertained by substracting from the par value of his share the premium he bid for the preference given him in taking the loan? The solution of this question must depend on the meaning of the words " loans advanced and premiums bid by members" as used in sec. 27 of chap. 54 of Code of West Virginia, under which act building associations in this State are organized. The language used in this section is " Every such corporation is authorized to levy and collect from its members such sums of money, by stated dues, fines, interest on *loans advanced, and premiums bid* by members for the right of precedence in taking loans, as the corporation by its laws shall provide." The section concludes: " provided that the dues, fines and premiums paid by the members of such corporation, although paid in addition to the legal rate of interest on loans taken by them, shall not be construed to make the loan so taken usurious."

The meaning of these words " *loans advanced and premiums bid,*" as used by the Legislature in the connection, in which they were used, we would naturally seek to find in the interpretation placed upon them in the practice of building associations in transactions of the character referred to in the statutes. These words are clearly in their connection to be regarded as in a sense technical. They were ordinary words but were used with reference to a new subject; and it was evidently felt, that neither the word premium nor the word loan would very accurately express the ideas intended to be conveyed; and a difficulty was experienced, as it is in many of the operations of a building association, to accurately express by ordinary language their extraordinary mode of doing business. The best the Legislature could do was to qualify the words " loan" and " premium," which did not express accurately the ideas intended to be conveyed, and to say " loans ad-

vanced" and " premiums bid." The practice of building associations had given to those words a meaning, which was to some extent definite ; and we must presume, that this was the meaning, which the Legislature intended to convey by the use of these phrases in this 27th section.

In England both prior to and after the act passed in 1836 for the chartering of building associations, their mode of doing business bears in many respects a striking resemblance to the mode, in which such business is usually done in this State. This mode of doing business is given in *Fleming* v. *Self,* 27 Eng. Law & Eq. 491. When that association had money on hand, it offered it to the member, who would allow the largest discount on the par value of his shares at the end of the association ; and he gave security very similar to that given in the present case, the only marked difference being, that instead of paying interest monthly on the sum of money actually advanced or, as is demanded by the association in this case, interest on the par value of his shares, the redeeming member paid monthly a certain specified sum named in the constitution on each share redeemed. But in fixing this sum called *redemption-money,* required by its constitution to be paid, as we may judge from the amount constantly received, an amount was selected less even than the legal rates of interest on the sum, which on an average would be actually advanced. Thus in the building association whose case was before the Court in *Fleming* v. *Self,* 27 Eng. L. & Eq. 491, this redemption-money would be as shown by a calculation only two and one tenth per cent. interest on the par value of the shares, that is it was only 3*s.*, 6*d.* per month on a share upon par value was £100.

In *Mosley* v. *Baker* this redemption money in another association was at precisely the same rate per cent. on the par value of the shares, that is, 2 1-10 per cent. per annum or four shillings per month on £120, the par value of a share in that association.

This would be probably only between 3 and 4 per cent. per annum on the amount of money, which on an average would be paid by a building association to a member on the redemption of his shares, as the premium would range from say 30 to 50 per cent, on the par value of the shares,

This redemption money paid monthly or quarterly, for which is substituted our monthly or quarterly payments of interest by the redeeming member, was thus, it appears, according to the established practice of the English building associations both before and after their incorporation in 1836 fixed at a moderate interest on the money actually paid to the redeeming member and was not fixed as fair interest on the par value of the shares at the close of the association.   This could.be clearly shown by a further examination of the English decisions.   But the two cases, which we have cited, sufficiently show this to have been their practice.   The inference then is, that these building associations in England regarded, what is called in our statute the "premium bid for the preference in taking a loan," not as a sum of money to be paid in cash by the redeeming member for this preference, as they did not charge a fair rate of interest on the par value of the shares redeemed, but as the amount, which the member agreed to discount at the close of the association from the par value of his shares in consideration of the money being now advanced to him, as is shown by their in effect charging a moderate rate of interest on the amount of money actually paid to the member and not on the par value of his shares.   Upon this money actually advanced he paid a moderate interest at stated intervals, which was called *redemption mòney.*   It was not any stated per cent. on either the money advanced or on the par value of the shares; but it was a fixed sum, so fixed in practice, as to be a moderate interest on the sum actually advanced, and was far below the legal rate of interest on the par value of the shares.   In other words, they did not treat the redeeming member, as though his bid was a bid of so much cash for the precedence on obtaining the loan, as the association in the case before us insists, that it has a right to do; but they treated him, as though his bid was a discount agreed to be made from the par value of his shares at the close of the association.   This same result would be reached in the case before us by charging the appellants with interest on the moneys actually received by them instead of on the par value of their shares, the full amount of the notes, which they have executed.

That this was the manner, in which the English building

associations regarded the redemption of a share by a member, is shown further from the very language they use in explaining the character of the transaction. Thus the Lord Chancellor in *Fleming* v. *Self*, 27 Eng. Law & Eq. 501 says: "One main object is to enable the members to obtain their £100.00 (the par value of the shares) by anticipation on their allowing a large *discount*. For this purpose, when a sufficient sum is in the hands of the treasurer, the members, who desire to get their shares in advance, bid by a sort of auction the sum, which they are ready to allow as a *discount*, and the highest bidder obtains the advance." But that this bid, which is called a premium, is not understood by the practice of the English building associations as a cash price to be paid by the member for the preference, but as a *discount* from the value of the share, when it is to be settled at the close of the association, is still further shown by what the chancellor says in same case pages 501 and 502: "The gain to the society arises mainly from the high rate of *discount*, which the members in want of money are ready to give; in truth the scheme is an elaborate contrivance for enabling persons having sums, for which they have no immediate want, to lend them to others at a very high rate."

The profits of the association then were based, it thus appears, on the high rates of *discount*, or as we would say, the larger premiums bid, not upon the high rates of charges as the monthly redemption-money, or as we would say, not upon the large amount of interest paid on the money advanced to the redeeming member. If the rule is authorized here and the practice adopted be to allow interest to be charged on the par value of the shares instead of on the money advanced, a new and large source of profit would be added to what by the established practice in England is regarded as their main source of profit. We ought not, it seems to me, by a strained interpretation of our statute-law to hold, that it was the purpose of the Legislature to add to the sources of profit, to which the English building associations looked, another great source of profit never contemplated by them. If under this English practice these building associations are becoming elaborate contrivances for enabling persons to practice usury, we should not incline to so interpret our

statute-law as to give a new and fresh stimulus to this tendency to degeneration on their part.

Building associations commenced being established in this country about the time, when they first became in England incorporated institutions, though they had existed there for years before as voluntary associations.  In what light were these premiums bid for precedence in taking loans regarded in this country as shown by the general practice of associations ?  As so much cash, which the redeeming member was willing to pay for the preference?  Or as so much per cent. he was willing to have discounted from the par value of his shares, when the building association closed ?  These premiums were in England, as we have seen, regarded not as an offer by the redeeming member to pay so much cash for the preference in taking the loan but as an offer to *discount* so much at the close of the association from the par value of his shares, if the preference be given him in taking the loan.  In this country the practice has not been uniform.  Sometimes building associations, when not forbidden by the statute-laws interpreted by the courts, charged interest only on the amount actually loaned or in its stead a fixed redemption-fee as in England, which was apparently intended only to cover a moderate interest on the sum actually received ; and sometimes they charged interest on the whole amount of the stock or fixed a redemption-fee in its stead large enough or even more than sufficient to cover the interest on the whole amount of the stock.  See *Hoboken Building Association* v. *Martin,* 13 N. J. Ch'y 427 ; *Mechanics' Building & Loan Association* v. *Conover,* 14 N. J. Eq. 220 ; *Franklin Building Association* v. *Marsh* 29 N. J. Law 226 ; *Shannon* v. *Dunn,* 43 N. H. 194 ; *Houser* v. *Herman Building Association,* 41 Pa. St. 480 ; *Wolbach* v. *Lehigh Building Association,* 84 Pa. St. 214 ; *Merrill et als.* v. *McIntire,* 13 Gray 157.

Most of the cases reported in this country are so imperfectly reported, that it is impossible to tell, whether the building associations named charged to redeeming members interest on the par value of their stock or interest only on the amount of money actually advanced to them by the association.  And in some of those I have cited this difficulty exists ; but from the reported cases in the United States we may, I think, safely

say, that there was at the time, when we passed our homestead and building association law above referred to, much diversity on this point in the practice of associations in this country. It should also be borne in mind in interpreting our statute-law, that in a number of the States of this Union this redemption of shares in the statute authorizing building associations to redeem them, is spoken of not as a loan but as the receipt of money for a bonus on shares for the privilege of receiving the same in advance prior to the same being realized or words importing this, in this respect following the English Statute of 6 and 7 Wm. IV, ch. 32, § 2, for which see note to *Doe* v. *Glover*, 15 Ad. & E. 106, (69 E. C. L. 104.)

These were the circumstances, under which chapter 54 of the Code of West Virginia was passed; and aided by these circumstances we are to interpret the 27th section of that act (see Code of W. Va. 411.) Its language, which we have already quoted but repeat for convenience, is: "Every such corporation is authorized to levy, assess and collect from its members such sums of money by stated dues, fines, *interest on loans advanced and premiums bid by members for the right of precedence in taking loans,* as the corporation by its laws shall provide." The section closes: "*Provided,* That the dues, fines, and premiums paid by the members of such corporation, although paid in addition to the legal rate of interest on loans taken by them, shall not be construed to make the loans so taken usurious." When it is remembered, that the English courts under their statute had declared, that the redemption of a share of stock by a building association was, as its statute declared, "an advance of money coming to a member prior to its being realized" and could not therefore be regarded as *a loan,* and that therefore the usury-laws could not be applied to such transactions; and further when it is remembered, that under like legislation building associations in this country had in some States been declared as entirely exempted from the usury-laws in dealings with its members; (see *Citizens Mutual Loan Association* v. *Webster,* 25 Barb. 270, 271; *Franklin Building Association* v. *Marsh,* 29 N. J. L. 231); and when it is further remembered, that many courts in this country had spoken of the oppressions of some building associations and their tendency to become mere schemes to evade the usury-

laws, it will appear obvious, that our statute in effect designates a redemption of a share by a building association as a loan purposely, and designed thereby to render such associations liable to the usury-law, except so far and so far only as they were by the proviso above quoted exempted from the operation of the usury-laws.   This was held by this Court in *Pfeister* v. *The Wheeling Building Association, supra.*

In interpreting the extent of this loan, on which the association is authorized to take legal interest only, we should bear in mind the obvious spirit, which pervades this statute, to prevent oppressive exactions by such associations as far as it can be done consistently with the main object of building associations to aid poor men in obtaining homes.   And this should incline us, if the meaning of the Legislature is doubtful, to favor a construction, which will tend to prevent unreasonable exactions; and this is the more especially proper, when we reflect, that in construing a statute granting power to any corporation the general rule is to construe it strictly against the corporation, as is laid down in *Pfeister* v. *The Wheeling Building Association, supra.*   Guided by these considerations it does seem to me, that the words used in lhe 27th section of our statute : "Every such corporation is authorized to collect from its members such sums of money by *interet on loans advanced,* as the corporation by its laws shall provide" in connection with the proviso, which speaks of "premiums paid in addition to the *legal rate of interest on loans*" mean to declare, that this loan, on which they are authorized to take legal interest only, is the money *actually advanced* to the member and *paid* to him for his own use by the association exclusive of the premiums.   The proviso expressly says : "that the *premium* paid by members in addition to the legal rate of interest on loans taken by them shall not be construed to make the loan usurious."

If the Legislature had intended, that the taking of interest on the premiums as well as the taking of the premiums themselves should not make these loans usurious, would they not have said so in their proviso ?   How easy and natural would it have been to have said : " That the premiums *and interest on them* paid by members, &c., should not be construed to make the loans usurious."   Especially would we have antici-

pated the use of language of this sort, when it is known, that the practice of various building associations differed in reference to this taking of interest on premiums. This omission seems to me particularly significant, as controversies had arisen before the passage of this act as to the right of such corporation to demand interest on premiums, and in some cases it had been decided against the right. The Pennsylvania legislature had enacted, as early as 1859 an act (see Bright. Purd. Dig. 184, §6) whereby it was declared : " No premiums, fines, *or interest on premiums*, that may accrue to said corporations according to the provisions of this act, shall be deemed usurious." See *Wolbach* v. *The Lehigh Building Association,* 84 Pa. St. 216-217 ; *Kupfort* v. *William Tell Association,* 30 Pa. St. 465 ; *Houser* v. *Hermann Building Association,* 41 Pa. St. 480.

This omission, when naming the right of the association to take these premiums, to add the words, *and interest on such premiums,* as was done in the Pennsylvania statute, taken in connection with the fact, that in authorizing them to collect sums of money by *interest on loans* it added the significant word *advanced,* it seems to me, shows, that the Legislature intended only to authorize legal interest to be taken on moneys advanced as distinguished from premiums, which were not even actually advanced ; and that the Legislature designed, that these premiums should not be regarded as constructively advanced and as constituting a part of the loan, on which they were authorized to charge legal interest only. The Legislature, it seems to me, regarded these premiums as not paid in cash at the time of the loan but as paid to the association at its close, and the bids of these *premiums* as offers to allow the sum named as a *discount* on the par value of the shares redeemed at the close of the association, when the value of the shares was to be paid to the members in cash by the association.

The associations are authorized to take security for the payment of the dues, &c., on their redeemed shares, so that they may be certain to get the promised bonus or premium, at the close of the association, if the dues, &c., be paid. In fact it always remains in their hands and is simply retained at the time, when it would otherwise have to be paid to the member, that is, at the close of the association.

This and this only is in my judgment the character of the transaction, which the building association is authorized to perform. If it transcends its authority and takes more than legal interest on the loan by taking interest on the premium, it becomes subject to the usury-laws and cannot collect this usurious interest, and if collected, it must refund the amount on settlement. The deeds of trust therefore should be regarded as taken to secure the actual loan, that is, the money paid to the member to be used by him in building, &c. ; and the stock of the member is retained by the association as collateral security for the repayment of this loan and the payment of his premium together with the interest on the sum actually loaned ; and the deed of trust legitimately secures also the dues and fines on this stock and the taxes and insurance on the property to make it and the pledge of stock available as a security.

The views, which we have above expressed, are sustained by decisions in other States. In *Building Association v. Eastman*, 31 Md. 556, the by-laws of the association provided : "Any member having taken a loan may obtain a release of his property mortgaged to the association by paying back to the association the difference between the dues he has paid in and *the amount borrowed*," &c. The words *the amount borrowed* were interpreted by the court to mean the money *actually advanced* to the redeeming member and not the par value of his shares redeemed. This is the same interpretation we have given to the words of our statute, *loan advanced*. The meaning of these words is obviously identical.

An act of the State of Maryland, passed in 1867, permits a mortgage given to a building association to stipulate for the payment of weekly instalments on the shares redeemed "*together with interest on the sum so paid or advanced.* See *Baltimore Permanent Building and Land Society v. Taylor*, 41 Md. 418. The court decided, that these words " clearly mean interest on the sum actually received by the mortgager from the society and not interest on the par value of the shares. This is the construction, we have placed on the equivalent terms 'amount borrowed' in *Oak Cottage Building Association v. Eastman & Rogers*, 31 Md. 561." This is the construction, which we have put above on equivalent words in our statute.

In *The Forest City United Land and Building Association* v.

*Gallagher et als.*, 25 Ohio St. 215-216, the court had under consideration the construction of this statute, passed February 21, 1867. This statute was quoted in *Pfeister* v. *The Wheeling Building Association, supra,* and is in language almost identical with our statute. The Ohio court says: " The statute does not authorize the exaction of interest on the premium. The extent of the plaintiff's demand, exclusive of fines, is to require the payment of the stated dues and interest on the *money advanced,* until the time arrives for winding up the affairs of the association. The *premium* is then to be accounted for by the borrower as so much money advanced toward the redemption or payment of his stock. Interest is intended by the statute as a compensation for the use of the money the borrower receives. The higher the premium the less the money the borrower gets; and if interest were also to be charged on the premium, the less money he has to use, the higher the rates of interest he will have to pay for it. A declared object of the statute, as expressed in its title in authorizing the associations, is to enable their members to obtain for themselves homesteads. To justify an exaction so well calculated in its practical result to defeat this object, as this exorbitant demand for interest, the authority for it ought to be unequivocally expressed. But it may be said, as there is no limit to the premium that may be allowed, the question as to interest is immaterial ; that whether the premium be high and the interest low or the interest high and the premium low the result is practically the same. The borrower is more likely to be imposed upon by confounding the interest and the premium. Besides the statute distinguishes between premiums and loans and only authorizes interest on the 'loans advanced.' And while it is our duty to enforce the statute, according to its true meaning, yet we are also bound to see, that it is not made to subserve the purposes of extortion and oppression beyond what its terms required."

Under a Connecticut statute a building association was authorized to take a bonus or premium for a loan to its members. In the *Mutual Savings Bank & Building Association* v. *Wilcox,* 24 Conn. 155 the Court held, that the association had not a right to distribute the bonus, which it could take for such loan, during the time, that the loan had to run, adding it

to the interest on the loan; and if it did so, such bonus again to be paid along with the interest could not be enforced; and such a contract was usurious. The argument was made, that the bonus might be of any amount; that there was really no limit to the exaction, that might take place, in case the bonus was to be paid as one sum any more than if distributed with the interest and paid in small sums from time to time. But the court shows on pages 155 and 156, that this departure from the mode of taking the bonus authorized by the statute was well calculated to lead to extortion, because the borrower could not well see the large bonus, which he had agreed to pay, when it was thus distributed, and was therefore more liable to be imposed upon by a contract in this form.

I believe the same is true in the case before us. If building associations were permitted to take interest on premiums, they would thereby have their opportunities of exaction much increased.

The North Carolina statute simply authorized building associations to be incorporated without defining their powers but simply conferred on them the usual powers of a corporation; but the statute in its preamble states, that the object of such associations is to enable their members to secure homesteads. It was held in that State, that it was usurious to charge interest on the premium bid on the redemption of shares. The case however goes much further and is a strong denunciation of building associations generally; and we are not disposed to regard the views generally expressed in this decision with approbation.

The case of *Martin* v. *The Nashville Building Association et al.*, 2 Cold. (Tenn.) 418, is of a similar character.

There have been some cases, where the interest on the premium has been allowed by the courts on a redemption of shares of stock, as in *Building Association* v. *Richards*, 21 Ga. 592. But a by-law of the association expressly authorized it; and the Legislature had by law expressly conferred on the corporation all the powers and rights contained in the constitution referred to in the act. The court spoke of this as very hasty and ill-advised legislation. In the *Building Association* v. *Webster*, 25 Barb. 263, interest was allowed to be collected on the par value of the shares redeemed; but the

New York statute provided, that the payment of any monthly payments required by the articles of the association should not be deemed a violation of the statute against usury, and the monthly payment of their interest was required in this manner in that case.   The court on pages 270-71 says: "The obvious design of the statute was to remove these transactions between the society and its members beyond the reach of the statute against usury."   Our statute is obviously not designed to produce such results.   There are a number of States, as is shown in the case of *Pfeister* v. *The Building Association, supra,* in which a redemption of shares by a building association under their statute-law is not regarded by the courts as a loan.   Of course in such States, where the constitution of a building association provides, that the redeeming member shall pay interest on the full amount of the par value of the shares redeemed, and the member has agreed to do so, this agreement is enforced by the courts, as the usury-statutes have by virtue of their statutes in relation to building associations no application to transactions between building associations and their members.   In most cases in such States the enforcement of a contract to pay interest on the par value of the shares redeemed has been enforced as a matter of course and without comment, the reports often leaving it doubtful even, whether interest was paid on the par value of the shares or only on the actual amount of money paid to the redeeming member.   Occasionally however the courts in such cases have noted, what interest was paid, and have upheld it, when required to be paid on the full amount of the par value of the shares basing their decision on the ground, that the transaction was not a loan of money, and therefore the usury-statutes could have no application to such a case.   See *Edeline* v. *Pascoe,* 22 Grat. 826.   *White* v. *Building Association,* 22 Grat. 826.

In some of the building associations in New Jersey they have adopted the old English mode.   Instead of paying interest either on the sum advanced or on the par value of his shares the redeeming member pays monthly stipulated sums called *redemption-money.*   In other instances in that State the building associations have required of the redeeming member payment of interest on the par value of his shares redeemed

and this has been upheld by the courts, they having decided, that the redemption of a share by a member of a building association was not a borrowing and lending and therefore not subject to the usury laws. This decision was, as shown in the case of *Pfeister* v. *The Wheeling Building Association, supra,* probably influenced by the wording of their statute, to which I have not access. For the law and practice in New Jersey on this subject see *Hoboken Building Association* v. *Martin,* 13 N. J. Eq. 427–430; *Mechanics' Building Association* v. *Conover,* 14 N. J. Eq. 219–222; *Clarksville Building Association* v. *Stephens,* 26 N. J. Eq. 351; *Franklin Building Association* v. *Marsh,* 29 N. J. Law 225.

We conclude, that in this State a building association has no right to take interest from a member, who has redeemed his shares, on the par value of the shares but only on the amount actually paid in cash to the member by the association. This conclusion is not only sustained by reason but by the authorities. It was decided in *Parker* v. *United States Building Land and Loan Association et als., supra,* that a building association has in this State no right to impose a fine on a member for failing to pay promptly interest on the money, which he has borrowed; and in *McGannon* v. *Central Building Association et als., supra,* it was held, that a building association has a right to impose reasonable fines on a member for not paying promptly his dues. In the first of these cases it was held, that the United States Land and Loan Association is a building association and entitled to all the privileges of such associations, and that John E. Parker was a member of the association, and that the fines fixed by the constitution of this association for non-payment of dues were reasonable. The facts appearing in the record in this case on all these points are the same as in that, and the same conclusions are reached. Parker & Brothers are estopped, as was John E. Parker in that case, from alleging, that they were not members of said association; and the provision contained in the 29th section of chapter 54 of the Code of West Virginia, that the constitution of building associations shall be signed by the members, must be considered as directory not mandatory. Though when there is a contest as to whether a person is a member raised by him promptly on an

allegation, that he did not understand, what were the provisions of the constitution, doubtless his failure to sign it would be of much weight; but when he has raised no such contest promptly but has acted as a member for years, as in this case, he is estopped from denying, that he is a member.

It was also decided in those cases, that while the taking of improper fines from a member, who has borrowed money, by a building association is usurious, it does not vitiate and render null the entire contract; but it does render it usurious, and the contract must be purged of its usury and then enforced. This is obviously equally true of the demand improperly of interest on the par value of the shares of a redeeming member instead of interest only on the money actually paid him by the building association. Of course the building association has a right to enforce under any of the deeds of trust in this case the repayment of any taxes or insurance paid on the property conveyed by the particular deed of trust.

In the case before us the building association has demanded and received of the appellants fines for the non-payment of interest promptly and has demanded and received interest on the par value of the shares redeemed by the appellants instead of demanding interest only on the money actually loaned and paid to the appellants. In the settlement of the accounts between the parties this usurious interest as well as the illegal fines must be disallowed and refunded by the building association. The erroneous amount admitted to be included in one of the deeds of trust by mistake or rather by the failure of the parties to carry' out fully an understanding had, when this deed of trust was given, must of course be corrected. In this case there was no allegation in the bill, that any portion of the money loaned the plaintiffs was used for any but legitimate purposes as stated in the statute, and it must be conclusively presumed, that all the moneys loaned were used only for such legitimate purposes, and this cannot now be questioned or disputed in this case. The amount due under each of the deeds of trust in this case ascertained according to the principles laid down in this opinion and the principles laid down in the three other causes, in which building associations were parties, decided by this Court at the same time, that this cause is decided.

The circuit court of Ohio County in its decree of May 17, 1879, adopting the views of the counsel of the United States Land, Loan and Building Association dissolved the injunction to the sale under some of these deeds of trust, which had been awarded.  This decree must for the reasons we have assigned be set aside, reversed and annulled ; and the appellants must recover of the appellee, the United States Land, Loan and Building Association, their costs in this court expended ; and this cause must be remanded to the circuit court with directions to ascertain the true balance due to the United States Land, Loan and Building Association, on each of said deeds of trust upon the principles laid down in this opinion and to enforce the payment of the same by sale, if necessary, of the property conveyed by each of said deeds of trust and further to proceed with the cause upon the principles laid down in this opinion and further upon the rules and principles governing courts of equity.

JUDGES JOHNSON AND HAYMOND CONCURRED.

DECREE REVERSED.  CAUSE REMANDED.